Filed 6/14/21  P. v. Alvarado CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B289898 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA439926) |
| v. | |
| SAULO ALVARADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen Kennedy, Judge.  Affirmed.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Noah P. Hill and Steven E. Mercer, Deputy Attorneys General, for Plaintiff and Respondent.

———————————————

## INTRODUCTION

A jury convicted Saulo Alvarado in 2018 of murdering his father, stepmother, and two half-brothers in 1999, and sexually abusing his half-sister. Alvarado contends the trial court erred by excluding evidence of one victim's alleged gang membership and by admitting evidence of an uncharged sexual offense. Alvarado also argues several statutes and pattern jury instructions are unconstitutional. Alvarado last asserts that a $10,000 restitution fine and a $200 sex offender fine should be stricken or stayed unless and until the People prove Alvarado's ability to pay them. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Amended Information*

The amended information charged Alvarado with four counts of first degree murder (Pen. Code,[1] § 187, subd. (a)); counts 1, 2, 3 and 4); one count of forcible lewd act upon a child under 14 years old (§ 288, subd. (b)(1); count 5); and one count of lewd act upon a child under 14 years old (§ 288, subd. (a); count 6). The information alleged as to counts 1 through 4 that the crimes were a multiple-murder special circumstance (§ 190.2, subd. (a)(3)), and as to counts 3 and 4 that Alvarado intentionally killed the victims by means of lying in wait (§ 190.2, subd. (a)(15)). The information alleged as to counts 1 through 4 that Alvarado personally and intentionally discharged a firearm which proximately caused great bodily injury or death (§ 12022.53, subd. (d)), personally and intentionally discharged a firearm

---

[1]    Unless otherwise designated all further statutory references are to the Penal Code.

(§ 12022.53, subd. (c)), and personally used a firearm (§ 12022.53, subd. (b)). Alvarado pleaded not guilty and denied the special allegations.

B. *The Evidence at Trial*

  1. *The crimes*

    a. *Late 1998 and early 1999*

In 1998 and 1999 Rodolfo Alvarado and his wife Eva ("Veronica") Alvarado lived in a three-bedroom, second-story apartment in South Los Angeles with their 16-year-old son Lorenzo ("Renzo"), their 10-year-old daughter Ashley Melissa, and their four-year-old son Victor.[2] Alvarado was Rodolfo's son from a previous relationship. Alvarado, who was 16 years old, moved into the apartment in the fall of 1998 and attended Crenshaw High School. Alvarado shared a bedroom with his half-brother Renzo.

Ashley testified[3] that in late 1998 or early 1999, as she and a friend played a computer game in one of the bedrooms, Alvarado grabbed Ashley's right hand and placed it against his penis. Ashley felt something "warm" and "wet" on her hand. When Ashley looked at Alvarado, he covered his genitals with his hands and laughed. Ashley, who was 10 years old, did not understand what the substance was, but she was "grossed out" and left the room to wash her hands.

On another occasion Alvarado hit Ashley "really hard" with a belt on her legs, leaving a bruise. On a different day Alvarado

---

[2] For clarity we refer to Rodolfo Alvarado, Veronica Alvarado, Renzo Alvarado, Ashley Alvarado, and Victor Alvarado by their first names.

[3] Ashley was 29 years old when she testified at the trial.

choked Ashley with both hands until she began to lose consciousness. Ashley's best friend Erica Reddish, who was nine years old in 1999, was present. Reddish saw the color in Ashley's face change as Alvarado choked her. Another time Reddish saw Alvarado cover Ashley's mouth with his hand until Ashley could not breathe. Both times Reddish told Alvarado to stop and tried to pull his hands away from Ashley's face.

Sometime in March 1999, Ashley told Veronica that Alvarado had hit and choked her. Veronica was "in shock"; she confronted Alvarado and told him he was not permitted to hit Ashley.

Around the same time, Ashley saw Alvarado and Rodolfo arguing in the apartment. Alvarado choked Rodolfo, who tried to push Alvarado away. Alvarado looked "aggressive," and Rodolfo was "pushing off [Alvarado] while [Alvarado] was choking him." Ashley yelled at them to stop. Alvarado stopped choking Rodolfo and walked out.

b. *April 26 and 27, 1999*

On the morning of April 26, 1999, Rodolfo drove Veronica, Alvarado, Ashley, and Victor to a health clinic for school vaccinations. Renzo was at school at Los Angeles High School. Following the vaccinations, Veronica, Alvarado, Ashley, and Victor took the bus to Los Angeles High School to see Renzo, who was getting out of school. After Veronica spoke with Renzo, Veronica, Alvarado, Ashley, and Victor took a taxi home. Victor went outside to play, and Ashley called a friend to come and play outside. Veronica sat in the dining room facing the window.

Alvarado entered the dining room with a gun in his hand. As Veronica looked out the window, Alvarado shot her in the back of her head. Ashley, who was still speaking to her friend on the

4

telephone, was shocked.  Veronica fell to the ground and made a gurgling noise.  Ashley walked to Veronica, and Alvarado took the telephone from her hand and hung it up.  Ashley threw some cups on the floor in an effort to compel Veronica to react, but Veronica did not respond.

A few minutes later Victor came back inside with a toy in his hand and ran into his bedroom.  Alvarado told Ashley to follow Victor into the same bedroom.  Alvarado pointed the gun at Victor's face; Victor swatted it away.  Alvarado again pointed the gun at Victor and shot him in the face from about three feet away.  Victor fell to the ground.

After Alvarado shot Victor, Ashley was in shock and "couldn't really comprehend anything anymore."  Alvarado told Ashley to get on the bed.  Alvarado pulled down Ashley's pants and underwear and pinned her arms above her head.  Alvarado took out his penis and rubbed it against Ashley's vagina and body.  Ashley kicked and screamed for Alvarado to stop.  Ashley felt "helpless and scared."  After about five minutes, Alvarado stopped and got dressed.

Ashley dressed and walked to her parents' bedroom.  Alvarado followed her.  Alvarado made statements about the grim reaper, and that he disliked that Ashley's family had his father but Alvarado did not.  Alvarado went to the closet in Renzo's bedroom and retrieved an ashtray with a grim reaper design on it.  Alvarado told Ashley the ashtray gave bad luck and would possess anyone who put ashes in it.  Alvarado also told Ashley that when he lived with his grandmother in Guatemala, he had seen the devil in the hallway of her house.

Alvarado put the gun on the bed in Renzo's room; Ashley picked it up and pointed it at Alvarado.  Alvarado laughed.  He told Ashley the safety was on, and he took the gun from her.

Ashley went to her parents' bedroom.  She was in shock and scared.  Ashley cried herself to sleep.

When she woke up, it was dark outside and the apartment lights were off, but light was coming in through the windows.  Ashley estimated it was 10:00 p.m. or 11:00 p.m.  Ashley found Alvarado in Renzo's bedroom, looking out a window.  Ashley walked over to see what Alvarado was looking at.  As Ashley looked out the window, Renzo arrived home, entered the bedroom, and asked Ashley what she was doing.  Ashley turned to face Renzo, and saw that Alvarado had moved behind the bedroom door.  Alvarado raised the gun and shot Renzo in the face from three to four feet away.  Renzo fell to the ground, and Alvarado left the room.

Minutes later Rodolfo appeared at the bedroom door.  Alvarado shot Rodolfo and he fell to the ground.  Rodolfo began crawling down the hallway.  Alvarado walked to Rodolfo, looked at him for a few seconds, and shot him again.  Ashley returned to her parents' bedroom and cried herself to sleep again.

Ashley was awakened between 6:00 a.m. and 7:30 a.m. the next morning by the sound of her neighbor Graciela Reyes knocking on the front door.  Reyes was Veronica's coworker, and each morning Reyes and Veronica would leave for work together.  Ashley walked to the living room; Alvarado stood next to her.  Alvarado gestured for Ashley to remain quiet.  Ashley was "terrified."  Reyes knocked for a minute or so and then left for work.  Alvarado told Ashley to put on her shoes, and he retrieved the car keys from Rodolfo's body.[4]

---

[4]     Ashley testified her family had one car, which Rodolfo drove, and that Rodolfo never let Alvarado borrow or drive the car.

6

Alvarado drove Ashley in Rodolfo's car down the street, where he picked up a friend Ashley did not know and had never seen before. Ashley described the friend, who was later identified as Marvin Escobar, as male, Hispanic, and about Alvarado's age. Escobar got into the front passenger seat, and Alvarado drove to a gas station. Alvarado and Escobar got out of the car and spoke to each other; Escobar returned to the car and asked Ashley if it was true Alvarado had killed his family. Ashley replied, "Yes." Alvarado dropped Escobar at his house and returned with Ashley to the apartment. Ashley estimated she and Alvarado had been away from the apartment for 15 or 20 minutes.

When Alvarado and Ashley were back inside the apartment, Ashley was "very distraught." Alvarado told Ashley to call 911 and to ask for someone who spoke Spanish. Ashley called 911 from the living room at 9:01 a.m. During the call, Ashley saw Alvarado wiping the gun with a rag and walking towards Renzo's bedroom. Alvarado then took the telephone from Ashley to speak to the 911 operator. Ashley went to Renzo's bedroom and saw that Alvarado had placed the gun in Renzo's hand. She also saw that a candle had been placed near Renzo's body.

Alvarado and Ashley went outside to wait for the police. Alvarado told Ashley to tell the police he had been taking her to school but she had forgotten her backpack, and when they returned to the apartment to retrieve the backpack they had discovered the bodies. Alvarado told Ashley he would kill her if she refused.

Police officers, including Los Angeles Police Officer Jay Nam, arrived at the apartment at 9:05 a.m. The door was ajar; once it was opened, Officer Nam immediately smelled natural gas and saw Rodolfo's body lying in the hallway. Officer Nam entered the apartment and found the other three bodies.

7

2.    *The 1999 investigation*

      a.    *The crime scene*

Homicide detectives arrived at the apartment at 10:05 a.m. Rodolfo's body was covered by a blanket. Veronica's body was face up on the floor of the parents' bedroom. The body had been draped with a blanket and there was a pillow under her head. Veronica's body had livor mortis discoloration (discoloration from blood pooling in the tissue) on her right knee, which was inconsistent with the position of her body, indicating that someone had moved her body after her death. Victor's body was lying on its side, partially covered by a blanket, with a toy near his left hand. Livor mortis discoloration indicated Victor's body had been moved after death. Victor's face showed discoloration that indicated the body had been face down at some point.

Renzo's body was face up on the floor of his bedroom. A six-shot .22-caliber revolver with five expended shell casings and one live round was in Renzo's hand. The serial number on the gun had been scratched out, and "AK" had been etched on the frame. Police found a box of ammunition in Renzo's jacket pocket, and additional .22-caliber rounds and spent casings in the apartment. A red candle with a recently-lit wick was on the floor near Renzo's body.

      b.    *Initial police interviews*

Police brought Ashley and Alvarado to the police station at 10:30 a.m. The homicide detectives believed they were surviving family members and did not consider them suspects. Detectives interviewed Ashley for 10 or 15 minutes. Ashley was "very upset," crying, and reserved. The detective did not want "to push her," and the interview was not recorded. Afraid of Alvarado, Ashley repeated the story he had instructed her to tell.

8

Detectives interviewed Alvarado for approximately 30 minutes. His interview was recorded and played for the jury. Alvarado told Detective Terrence Fathauer that earlier that morning he took Ashley to school and picked up his friends Marvin Escobar and Marvin Estrada. Alvarado said he had left his backpack at home, so he and Ashley returned to the apartment. Alvarado said he immediately smelled gas, and turned off four gas burners on the stove. He said he heard a "gurgling" sound from Rodolfo, and he checked Rodolfo for a pulse. Alvarado told Detective Fathauer he then discovered the other bodies.

At a second interview two weeks later, Alvarado denied moving Victor's body. Alvarado said he had blown out the candle next to Renzo's body. Alvarado gave the detectives a drawing he had made that showed four graves for his family members, along with his name and jail cell bars. Alvarado claimed to have fired the gun the afternoon before the murders, and said that Renzo fired the gun "almost daily" from the window of his bedroom.

Ashley's uncle (Veronica's brother) and his wife picked up Ashley from the police station on April 27, 1999 and took her to their house. Officers asked if they would take Alvarado too, but Ashley told her uncle and a detective she did not want Alvarado near her. Because Alvarado did not have any family member to take custody of him, the police placed him with the Department of Children and Family Services.

A few days later Ashley and Alvarado attended a joint funeral for the family. Reddish saw Alvarado at the funeral "sweating and look[ing] stressed out." Reddish testified Alvarado "looked like he was shaking and there were gangbangers there threatening to kill the person who did it." Alvarado approached Ashley at the funeral, but she was "terrified of him" and got up and left. Ashley did not see or speak to Alvarado again.

9

### c. *The medical examiners' conclusions*

Medical examiners testified about the results of the autopsies performed in 1999.  Rodolfo had two fatal gunshot wounds to the left side of his head and one grazing gunshot wound to the left chin.  Victor was killed by a single gunshot to the right temple that had been fired while the gun muzzle was pressed against his skin.

Veronica was killed by a single gunshot to the back of her head.  The decomposition of Veronica's blood and organs was consistent with Veronica having been dead for approximately a day before her body was placed in cold storage at the coroner's office on April 27, 1999.

Renzo was killed by a single gunshot to the forehead that had been fired from a distance of six to 24 inches.  Dr. Ogbonna Chinwah, the medical examiner who performed Renzo's autopsy, concluded Renzo had committed suicide.  Dr. Chinwah testified Renzo's autopsy "was given to me just to—just quickly get it out of the way."  He testified Renzo's autopsy "was assigned to me by the supervisor.  The supervisor concluded it was a suicide and gave it to me as a suicide.  And I just went over it and moved the thing away . . . .  And so that's how that case went."

### d. *Police deem the case a murder-suicide perpetrated by Renzo*

On April 29, 1999, Detective Debra Winter, the senior detective on the case, opined the crime was a murder-suicide perpetrated by Renzo.  Detective Winter based her conclusion on the statements police had taken from Alvarado and Ashley and on finding the gun in Renzo's hand.  Detective Winter had not reviewed the 911 call and had not obtained the results of gunshot residue analysis of Renzo's hands.

Gunshot residue tests were performed in May 1999. Renzo did not have gunshot residue on either hand. Rodolfo had gunshot residue on his hands consistent with having fired a gun, having touched a surface that had gunshot residue on it, or having been shot. When the police received the results of the gunshot residue tests, Detective Winter had already closed the case, having concluded Renzo had killed his family and himself.

Ballistics testing showed the bullets recovered from the bodies had been fired from a .22-caliber gun. The bullet recovered from Renzo's body had been fired from the gun found in his hand; the other bullets were too deformed to determine conclusively whether they had been fired from that gun.

Detective Fathauer reviewed the transcript of the 911 call one-and-a-half weeks after the murders. The recording of the 911 call was played for the jury. Detective Fathauer testified Alvarado's statements on the call made him somewhat suspicious because, unlike a typical caller in similar circumstances, Alvarado offered extraneous information unrelated to the discovery of his family's bodies. Detective Fathauer also noted Alvarado did not mention the smell of gas.

### 3. *The 2012 investigation*

#### a. *Ashley comes forward*

Ashley did not speak about the murders for 13 years. When she started junior high school, her uncle told her to "bury it" and not to talk about it. During those years, Ashley was afraid of Alvarado, did not want to be accused of lying, and did not believe she could cope with revealing the truth. When family members asked Ashley about the murders, or suggested she see a therapist, she responded she did not want to discuss it.

11

In 2012, when Ashley was 23 or 24 years old, she was "very depressed" because "of the secret that [she] had to hold for so long." She "didn't know how to deal with it anymore." After taking an Ecstasy pill, drinking alcohol, and smoking marijuana, Ashley told her roommate Silvia Sikaffy "everything" about what Alvarado had done, "step-by-step." Sikaffy told Ashley to report the crimes to the police, but Ashley was afraid of Alvarado and did not know if she "was even going to be able to handle going through it."

On October 10, 2012, a month or two after speaking to Sikaffy, Ashley went with a friend to the 77th Division police station and spoke with Detective Mark Hahn. Ashley told Detective Hahn she had witnessed Alvarado murder her family, and Alvarado had "pinned" the blame on Renzo. Ashley testified she came forward because "[her] brother Renzo needed justice," and "we needed to clean [sic] our name."

After Detective Hahn interviewed Ashley, he requested DNA testing of a swab taken from blood in the dining room. The DNA profile matched Veronica's DNA profile, which verified Ashley's statement that Veronica had been shot in the dining room.

Detective Hahn interviewed Ashley again on October 24, 2012 and June 12, 2013. Ashley answered questions about the murders, and she described the incidents in which Alvarado choked her and put her hand against his penis after ejaculating. Ashley's October 10 and 24, 2012 police interviews were recorded and played for the jury.[5]

---

[5] Following the 2012 investigation, Alvarado was arrested in Guatemala and extradited to the United States. Detective Hahn interviewed Alvarado in custody; the interview was recorded and played for the jury.

### b. *The medical examiner concludes Renzo was murdered*

In 2013 Dr. Chinwah reviewed his 1999 autopsy of Renzo's body and concluded Renzo's death was a homicide. Dr. Chinwah testified that he changed the manner of death from suicide to homicide because the coroner's office "received additional information from the police department . . . that someone who did the killing wiped the gun off, wiped it and then placed it in the hand of [Renzo]." In addition, in 2013 Dr. Chinwah had the results of the 1999 gunshot residue tests that showed no gunshot residue on Renzo's hands. Dr. Chinwah had closed the case in April 1999 without receiving the results of the gunshot residue tests.

### 4. *Witness testimony*

#### a. *Prosecution witnesses*

##### i. *Marvin Escobar*

Marvin Escobar was 16 years old in 1999 and Alvarado's "close friend."[6] Escobar lived down the street from the Alvarados. Once when Escobar was at the Alvarados' apartment, Alvarado and Renzo showed him a gun.

Around 7:20 a.m. on the morning after the murders, Alvarado and Ashley arrived in Rodolfo's car to pick up Escobar. Escobar asked Alvarado why he was driving Rodolfo's car because Rodolfo did not permit him to drive it. Alvarado seemed nervous

---

[6] Escobar was deported to El Salvador in 2017. He was flown to the United States for Alvarado's trial and was in custody when he testified. Escobar stated he was not testifying in exchange for any "offers or deals."

and did not respond. Escobar "kept asking [Alvarado] what was going on"; Alvarado said he had killed his parents.

Alvarado stopped at a gas station to buy rolling papers so he and Escobar could smoke marijuana. Alvarado then drove toward Crenshaw High School. Escobar told Alvarado he wanted to "find out if it was true" that Alvarado had killed his parents, so Alvarado drove Escobar and Ashley back to the apartment.

Escobar and Alvarado left Ashley in the car and went upstairs to the apartment. As Alvarado opened the door, Escobar saw Rodolfo's body in the hallway. Escobar jumped over Rodolfo's body and found Renzo's body. Escobar saw a lighted candle near Renzo's body and a gun in Renzo's hand. Alvarado told Escobar he had turned the stove on; Escobar, fearing an explosion, told Alvarado to turn it off. Escobar told Alvarado he was leaving and that Alvarado should call the police.

Escobar went to school, returned home that afternoon, and went to a park. Police arrested Escobar that afternoon for a probation violation. Escobar did not tell the police about the murders. During a 2012 police interview, Escobar lied to the police and did not tell them about the murders because Escobar was in the country illegally and was afraid he would be taken into immigration custody. During a subsequent police interview in 2013, Escobar told the police Alvarado had confessed to the murders and Escobar had seen the bodies.

Escobar did not see Alvarado for about a year after the murders, when Alvarado arrived at Escobar's house with some friends. Alvarado told Escobar he could no longer smoke marijuana because his conscience was bothering him.

14

### ii.    *Monica Becerra*

Monica Becerra was Alvarado's girlfriend in 2003, when she was 19 years old.  Becerra testified that when she and Alvarado lived together in 2003 Alvarado told her he had murdered his family and "made it seem like" Renzo was the killer.  Alvarado told Becerra his mother had told him how to commit the murders, he had been hearing voices, and a dragon statue had been telling him what to do.  Alvarado's mother was present one of the times Alvarado confessed to Becerra; she told Becerra, "Oh, don't listen to him.  He's crazy."  Alvarado told Becerra he would get away with the murders "because he will come out of there like crazy."

### iii.    *Lee Jarmon*

Lee Jarmon was Renzo's best friend, and he lived with the Alvarados for a few months in 1998 and 1999 when he was 18 years old.  Jarmon moved out a few weeks before the murders. Jarmon told detectives Renzo had a gun, and that Jarmon had seen both Alvarado and Renzo with a gun in the apartment.

Jarmon and Renzo had made plans to meet the morning the bodies were discovered.  Jarmon drove to Renzo's apartment and saw Alvarado, Ashley, and Escobar in Escobar's front yard. Rodolfo's car was parked in front of Escobar's house.  Jarmon rolled down his window and asked Ashley, "Why aren't you in school?"  Ashley appeared "real nervous" and "scared."  Jarmon had never before seen Alvarado driving Rodolfo's car, and he had never seen Alvarado alone with Ashley on the street.  Jarmon asked Alvarado why he had Rodolfo's car; Alvarado responded "Atlanta, Georgia."  Jarmon said, "Bullshit.  They didn't say they were going to Atlanta, Georgia."

Jarmon pulled into the back of the apartment complex and blasted his car stereo to get Renzo's attention, but Renzo did not

15

come to the window as he usually did.  Jarmon ran upstairs and banged on the apartment door.  After about 15 minutes Jarmon drove away; Alvarado, Ashley, and Escobar were still outside.[7]

### iv.    *Jazmin Nunez*

Jazmin Nunez was 15 years old in 1999.  She met Alvarado at Crenshaw High School, and they began dating.  Alvarado told Nunez he loved his sister Ashley very much, but he hated his father because his father had left him in Guatemala.

Nunez testified that Alvarado was "very kind, very nice" at the beginning of their relationship, but later "he turned into someone else" and "became violent."  One day at school Alvarado became angry when Nunez hugged a male friend.  Alvarado pulled Nunez by the wrist and called her a "bitch" and "his property," and said Nunez needed to respect him.

Later that day, Alvarado and Nunez went to the Alvarados' apartment, which was empty.  Alvarado yelled at Nunez and pushed her onto the parents' bed.  Alvarado turned Nunez over, pinned her hands above her head, pulled her pants down, and forcibly raped her while she was face down.  Nunez struggled and screamed for Alvarado to stop and that he was hurting her.  When Alvarado finished, he "got up like nothing" and took a shower.  Nunez walked home.  A few days later, Nunez went back to the apartment to ask Alvarado, "[W]hy did he rape me?"  Another girl answered the door.  Nunez left crying.

---

[7]    Detective Winter testified Jarmon said during a police interview that he went to the apartment before he saw Alvarado, Ashley, and Escobar that day.  Detective Winter also testified Jarmon identified Escobar as "Merlin."

At school after the murders, Escobar told Nunez that Alvarado had confessed to killing his family. Nunez told her parents, who told her to not to speak to the police because they were immigrants and did not "want to get in trouble." Nunez's mother also said that if Alvarado had killed his family, he might also kill Nunez if she "snitch[ed]." Alvarado called Nunez and invited her to the family funeral, but her mother would not permit her to attend. During the call, Nunez asked Alvarado, "Did you kill your family?" Alvarado did not answer, and after a moment of silence, Alvarado hung up.

v. *Yessika Diaz*

Escobar told his neighbor Yessika Diaz, who was 14 or 15 years old in 1999, that Alvarado had confessed to the murders. Diaz told her friend Cindy Rivera. Diaz did not tell the police because Escobar had told her not to say anything, and because "back then [Diaz] was small and [she] was scared."

Two or three weeks before the murders, Diaz was at the Alvarados' apartment with Alvarado, Renzo, Escobar, and another girl. Alvarado "pulled out a gun" and "shot out the window." Diaz was "scared" and thought Alvarado "was out of his mind."

vi. *Alice Hargrave*

Alice Hargrave was approximately 15 years old in 1999, and lived in the apartment directly above the Alvarados. Hargrave knew the family well and would occasionally babysit Victor. Renzo was "very protective" of Ashley and Victor.

On or about January 22, 1999 Alvarado came to Hargrave's apartment complaining of a headache. Hargrave gave him a bottle of aspirin. Later that night or the next night, paramedics responded to a 911 call that Alvarado had overdosed on Tylenol.

Alvarado told paramedics he had taken four Tylenol PM tablets "to kill himself."[8]  As paramedics carried Alvarado out of the apartment complex on a stretcher, Hargrave heard Alvarado crying and saying, "They don't love me.  My brothers don't love me. . . .  [T]hey only take up for my sister and brothers."[9]

Hargrave testified Alvarado and Renzo showed her a gun in Renzo's bedroom before the murders.  She also testified that on the morning the bodies were discovered she heard Victor having a tantrum, that he suddenly stopped, and that she heard loud music after Victor stopped crying.  Hargrave attended the family funeral; she saw Alvarado approach Ashley, who "retreated and left."

### vii.    *Cindy Rivera*

Cindy Rivera was 15 or 16 years old in 1999.  She knew Alvarado and Escobar.  A week or two before the murders, Rivera was at the Alvarados' apartment with Alvarado, Renzo, Diaz, and another girl.  Alvarado "took out a gun" and "start[ed] firing outside the window."  Rivera was "scared" and thought Alvarado was "going crazy" and "was going to do something to [them]."

### viii.    *Graciela Reyes*

In addition to her testimony about knocking on the Alvarados' door on April 27, Graciela Reyes also told detectives that a week or so before the murders Alvarado and Renzo had a fight.  Veronica slapped Alvarado in an effort to separate Alvarado and Renzo.  Veronica told Reyes that after she slapped Alvarado,

---

[8]    Ashley testified Alvarado once told her he wanted to kill himself.

[9]    Hargrave's sister Anita Hargrave testified she heard Alvarado complain Rodolfo treated him differently than the other siblings.

18

he "looked at her in a very mean way" and his eyes "turned like those of a monster." Alvarado was "very angry," and he told Veronica no "old lady" had ever touched him. Reyes also testified Renzo "got along well" with Veronica, and "adored" Victor.

### ix. *Expert testimony*

Wilson Hayes testified as an expert in injury biomechanics. Hayes opined the likelihood that Renzo committed suicide was "extremely low." He also opined that, in light of the gunshot to Renzo's brain, it was "extremely unlikely" that as Renzo fell to the ground he would have been able to maintain his grasp on the gun and his finger on the trigger. In addition, if Renzo had fired the gun five or six times, there was an "extremely low probability" he would not have any gunshot residue on his hands. Hayes further concluded that when the gun was fired, the muzzle was six to 24 inches from Renzo's head, and that the bullet trajectory made it "physically impossible" for Renzo to have fired the shot.

Mindy Mechanic, a psychologist, testified that most incidents of sexual violence against children are neither reported nor acknowledged, but that even individuals who acknowledge they have been sexually abused do not report or disclose the abuse, especially during childhood. Mechanic testified that between 55 and 75 percent of people sexually abused as children disclose the abuse for the first time as adults.

### b. *Defense witnesses*

### i. *Marvin Estrada*

Marvin Estrada and Escobar were close friends and attended Crenshaw High School with Alvarado. On the morning the bodies were discovered, Estrada went to Escobar's house to walk to school with him. Alvarado was there with Ashley in a

19

four-door car; Ashley "looked like she was sick, or something was wrong with her." Alvarado drove Estrada and Escobar to school and dropped them off. A few days after the murders Escobar told Estrada and two other people that Alvarado had killed his family.

#### ii.  *Linda Jarmon*

Lee Jarmon's mother, Linda, lived across the street from the Alvarados in 1999. On the morning the bodies were discovered, she heard gunshots "early that morning," but could not determine where they had come from.

#### iii.  *Willette Huntley*

Willette Huntley lived across the street from the Alvarados in 1999 and knew Renzo. About eight months before the murders, Renzo came to Huntley's house crying and with a black eye. Renzo said his grandfather and father were hitting him. On another occasion, Renzo said he wanted to kill his father and protect his family from his father.

Huntley heard gunshots the morning the bodies were discovered, but she did not know where they had come from. Huntley told a detective in 2012 she heard the gunshots coming from Renzo's apartment and the apartment door was ajar.[10]

#### iv.  *Lucila Reyes*

Lucila Reyes lived on the third floor of the Alvarados' apartment complex in 1999. She knew the Alvarado family

---

[10]  Los Angeles Police Officer Owen Mills testified he interviewed Huntley at approximately 9:50 a.m. on April 27, 1999. Officer Mills asked Huntley if she had heard any gunshots; Huntley said no. Huntley did not tell Officer Mills Renzo said he wanted to kill his father.

because her mother Graciela Reyes worked with Veronica. Lucila Reyes last saw Veronica in the late afternoon or early evening the day before the murders; Veronica was with Ashley and Victor. Veronica seemed sad and quiet.

v.      *Expert testimony*

Jason Tovar, the chief forensic pathologist at the Sacramento County Coroner's Office, testified as a cause-of-death expert for the defense. Tovar opined it was not possible to determine conclusively the source of bloodstains on Renzo's sleeve. Tovar described a study that showed that in only 50 percent of firearm suicides is gunshot residue found on the victim's hand. Tovar testified Renzo could have maintained sufficient motor function in his right hand after the shooting to hold onto the gun, but that it was also possible Renzo's wound was immediately incapacitating.

Iris Blandon-Gitlin, a research psychologist, gave expert testimony for the defense about false memories and the limitations of human memory. Blandon-Gitlin testified that human memory does not record even consequential traumatic events "like a video camera," and that memories fade over time. Blandon-Gitlin also explained that people can develop false memories of events that did not occur, and that repeating a memory, whether true or false, makes the memory stronger.

C.     *The Jury Verdicts and the Sentencing*

The jury convicted Alvarado on all charges and found the multiple-murder special circumstance, the lying-in-wait special circumstance, and the firearm allegations true.

The trial court sentenced Alvarado on the murder counts (counts 1, 2, 3 and 4) to four consecutive terms of life without

21

parole, plus four terms of 25 years to life for the firearm enhancements pursuant to section 12022.53, subdivision (d). On count 5 (forcible lewd act upon a child under 14 years old) and count 6 (lewd act upon a child under 14 years old), the court sentenced Alvarado to a consecutive determinate aggregate term of 10 years, the upper term of eight years on count 5 and one-third the middle term of six years (two years) on count 6.[11] The court ordered Alvarado to pay $61,567 in victim restitution, a $10,000 restitution fine, and a $200 sex offender fine. The court awarded Alvarado 1,387 days of presentence custody credits.[12]

Alvarado filed a timely appeal.

## DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion by Excluding the Gang Evidence*

1. *Relevant proceedings*

Alvarado sought to introduce evidence Renzo was a member of the "Anybody Killer" gang and had inscribed the gang's initials

---

[11] Section 669, subdivision (a), provides, "Whenever a person is committed to prison on a life sentence which is ordered to run consecutive to any determinate term of imprisonment, the determinate term of imprisonment shall be served first and no part thereof shall be credited toward the person's eligibility for parole as calculated pursuant to Section 3046 or pursuant to any other section of law that establishes a minimum period of confinement under the life sentence before eligibility for parole."

[12] The trial court later awarded Alvarado an additional day of presentence custody credit for a total award of 1,388 days. The trial court denied Alvarado's postjudgment motions to strike or stay the restitution fine and to strike the sex offender fine.

"ABK" on the gun.[13]  Defense counsel argued Renzo's alleged gang membership was relevant because "it was one of the things that he was fighting over with his parents."  The trial court ruled Renzo's alleged gang membership and the name of the gang were irrelevant and more prejudicial than probative:

> "We are not going to infect this trial with that.
>
> [¶]  I . . . don't see how whether [Renzo] was a gang member is relevant to this domestic situation.
>
> [¶]  [I]f he committed suicide, I don't think that whether he was a gang member or not has anything to do with it.  If he killed his father and his stepbrother [*sic*] and his stepmother [*sic*], the fact that he was a gang member, if he was, . . . doesn't really have anything to do with it.  [¶]  [T]he mere fact that [Renzo] was in a gang . . . sounds like to me to . . . dirty him up on something that normally [defense counsel] would be arguing in most cases . . . I don't allow in with regard to defendants and defense witnesses.  [¶]  [I]t has to have some connection to what happened in that house."

Alvarado later sought to introduce evidence "Anybody Killer" and "ABK" were written on Renzo's bedroom wall to support an argument the initials on the gun proved Renzo owned the gun.  The court ruled the initials would be admitted, but the term "Anybody Killer" should not be mentioned before the jury.

---

[13]   Detective Winter testified the initials "AK" were etched on the gun frame.

23

2.    *Governing law and standard of review*

"Only relevant evidence is admissible at trial.  [Citation.] Under Evidence Code section 210, relevant evidence is evidence 'having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'  A trial court has 'considerable discretion' in determining the relevance of evidence.  [Citation.]  Similarly, the court has broad discretion under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects."  (*People v. Merriman* (2014) 60 Cal.4th 1, 74 (*Merriman*); accord, *People v. Hardy* (2018) 5 Cal.5th 56, 87; see *People v. Duff* (2014) 58 Cal.4th 527, 558 [reviewing courts "afford trial courts wide discretion in assessing whether in a given case a particular piece of evidence is relevant and whether it is more prejudicial than probative"].)

"A trial court's ruling on the admission or exclusion of evidence is reviewed for abuse of discretion."  (*People v. DeHoyos* (2013) 57 Cal.4th 79, 131; accord, *People v. Cowan* (2010) 50 Cal.4th 401, 462.)  "'A trial court's decision to admit or exclude evidence is a matter committed to its discretion "'and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'"'"  (*People v. Masters* (2016) 62 Cal.4th 1019, 1056.)

3.    *Analysis*

Alvarado's defense theory was that Renzo murdered his family and killed himself.  Alvarado contends that by excluding evidence of Renzo's alleged gang membership and that Renzo etched the gang's initials on the gun, the trial court prevented

24

Alvarado from "paint[ing] Renzo in a bad light" and tying Renzo to the gun, which would have helped Alvarado prove Renzo, not Alvarado, was the killer.

"A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt, but the evidence must consist of direct or circumstantial evidence that links the third person to the crime. It is not enough that another person has the motive or opportunity to commit it." (*People v. Abilez* (2007) 41 Cal.4th 472, 517; accord, *People v. McWhorter* (2009) 47 Cal.4th 318, 367-368; *People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).) "[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible (§ 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion (§ 352). We recognize that an inquiry into the admissibility of such evidence and the balancing required under [Evidence Code] section 352 will always turn on the facts of the case." (*Hall*, at p. 834.)

The trial court did not abuse its discretion in concluding the gang evidence was irrelevant and more prejudicial than probative. There was no evidence any of the crimes related to gangs or to Renzo's alleged membership in a gang. Both the People and Alvarado argued the murders stemmed from family discord, although they contended different family members committed the murders. Neither the People nor Alvarado argued the murders were gang-motivated.

Moreover, as Alvarado concedes, the People did not dispute that Renzo had access to the gun. Numerous witnesses testified they had seen both Renzo and Alvarado handle the gun. Escobar testified Renzo and Alvarado showed him a gun at the apartment. Jarmon told detectives Renzo had a gun, and that Jarmon had

25

seen both Renzo and Alvarado with a gun in the apartment. Hargrave testified Renzo and Alvarado showed her a gun in Renzo's bedroom before the murders. Whether Renzo etched gang initials on the gun was irrelevant to whether Renzo had access to the gun; the People did not contend he did not. The trial court did not abuse its discretion by excluding the gang evidence.[14]

B. *The Trial Court Did Not Abuse Its Discretion by Admitting the Uncharged Rape Evidence*

1. *Relevant proceedings*

The People moved pursuant to Evidence Code sections 1101 and 1108 to admit evidence of Alvarado's uncharged rape of Nunez as probative of the sex offense charges.[15] Defense counsel did not

_____

[14]   Alvarado argues the exclusion of the gang evidence also violated his rights to confront and cross-examine witnesses and to present a defense. Even if Alvarado did not forfeit these claims by failing to raise them in the trial court (see *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1028, fn. 19; *People v. Partida* (2005) 37 Cal.4th 428, 435), the claims lack merit. "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice." (*Hall*, *supra*, 41 Cal.3d at p. 834; see *People v. Hovarter* (2008) 44 Cal.4th 983, 1010 ["The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.'"]; *People v. Benavides* (2005) 35 Cal.4th 69, 91; *People v. Brown* (2003) 31 Cal.4th 518, 545.) As discussed, the gang evidence was irrelevant to any material issues in dispute.

[15]   Evidence Code section 1101 prohibits the admission of evidence of a defendant's character, including evidence of character in the form of specific instances of uncharged

26

file a written opposition to the People's motion, but objected orally the evidence was "late discovery." The trial court ruled the evidence was admissible:

> "I do think it's admissible. I don't think that the People delayed in revealing that information to the defense. [¶] [Nunez and Ashley] are both underaged females, raped allegedly in the apartment, no one else present, with a very similar M.O. And under [Evidence Code section] 1108, as well as [Evidence Code section] 1101, the court believes that it is not more prejudicial than probative. After all, the four murders are far more serious than those sex charges by themselves. And so I am going to allow the admissibility [*sic*] of that evidence."

Consistent with the court's ruling, Nunez testified Alvarado raped her in the apartment a few weeks before the murders.

### 2. *Governing law and standard of review*

"The general public policy on character or propensity evidence is that it is *not* admissible to prove conduct on a given occasion." (*People v. Cottone* (2013) 57 Cal.4th 269, 285.) Evidence Code section 1108 is an exception to this general policy. It provides in relevant part: "In a criminal action in which the

---

misconduct, to prove the defendant's conduct on a specified occasion, except that evidence of uncharged misconduct may be admitted when such evidence is relevant to establish some fact other than the defendant's character or disposition, such as identity, common plan, or intent. Evidence Code section 1108 permits the admission of evidence of uncharged sex offenses to show the defendant has a disposition or propensity to commit sex offenses.

27

defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by [Evidence Code] [s]ection 1101, if the evidence is not inadmissible pursuant to [Evidence Code] [s]ection 352." (Evid. Code, § 1108, subd. (a).) Under Evidence Code section 1108, evidence of uncharged sex offenses is admissible to show the defendant has a disposition or propensity to commit sex offenses. (*People v. Falsetta* (1999) 21 Cal.4th 903, 910-911 (*Falsetta*).)

Evidence Code section 1108 establishes a "strong presumption of admissibility" of sexual offense evidence to show propensity to commit the charged offense. (*Merriman*, *supra*, 60 Cal.4th at p. 42.) It nonetheless "preserves the trial court's discretion to exclude evidence under [Evidence Code] section 352 if its prejudicial effect substantially outweighs its probative value." (*People v. Story* (2009) 45 Cal.4th 1282, 1294-1295.)

Five factors are "particularly significant" in an Evidence Code section 1108 analysis: (1) whether the propensity evidence has probative value, e.g., whether the uncharged conduct is similar enough to the charged behavior to tend to show defendant did in fact commit the charged offense; (2) whether the propensity evidence is stronger and more inflammatory than evidence of the defendant's charged acts; (3) whether the uncharged conduct is remote or stale; (4) whether the propensity evidence is likely to confuse or distract the jurors from their main inquiry, e.g., whether the jury might be tempted to punish the defendant for his uncharged, unpunished conduct; and (5) whether admission of the propensity evidence will require an undue consumption of time. (*People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117 (*Nguyen*).) A ruling admitting evidence under

28

Evidence Code section 1108 is reviewed for abuse of discretion. (*People v. Erskine* (2019) 7 Cal.5th 279, 296 (*Erskine*).)

### 3. *Analysis*

Alvarado contends the trial court abused its discretion under Evidence Code section 352 by admitting the uncharged rape evidence pursuant to Evidence Code section 1108. The factors relevant to the Evidence Code section 1108 analysis demonstrate the trial court did not abuse its discretion.

First, the similarity of the offenses renders the uncharged rape evidence probative. Both Nunez and Ashley were underage, lacked capacity to consent, and were alone with Alvarado in the apartment. Alvarado subdued both of them by pinning their wrists above their heads before attacking them. Alvarado claims the uncharged and charged offenses had "very dissimilar factual underpinnings" because Alvarado and Nunez were in a "dating relationship." That Alvarado's relationship with Nunez may have been different in nature from his relationship with Ashley does not demonstrate he did not employ similar methods in both attacks.[16] The uncharged rape evidence was "similar enough to the charged behavior to tend to show" Alvarado committed the charged offenses. (*Nguyen, supra*, 184 Cal.App.4th at p. 1117.)

Second, the uncharged rape evidence was not more inflammatory than Ashley's testimony about the charged offenses. (See *People v. Ennis* (2010) 190 Cal.App.4th 721, 725-726 (*Ennis*) ["[w]hatever emotional bias might have been invoked against

---

[16] Defense counsel cross-examined Nunez about her relationship with Alvarado, and argued the jury should disbelieve Nunez's account of her rape because Alvarado's relationship with Nunez was "like a romance novel" and "a bad television show."

Ennis at trial, would have been fully invoked by the multitude of horrific crimes actually charged in this case. The additional evidence suggesting he may have done more of the same to one of those victims, and perhaps to another family member as well, in Arizona, would not significantly change the jury's perception of him"].) In addition, the trial court instructed the jury that the uncharged rape evidence "is not sufficient by itself to prove that the defendant is guilty of the crimes alleged in counts five and six. The People must still prove each charge beyond a reasonable doubt."

Third, the uncharged rape was not remote or stale. Nunez testified Alvarado raped her in the apartment two to three weeks before the murders and Ashley's assault. (Cf. *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1276 (*Hollie*) [two years between offenses not remote]; see also *People v. Robertson* (2012) 208 Cal.App.4th 965, 992 [34 years between offenses not too remote]; *People v. Branch* (2001) 91 Cal.App.4th 274, 285 [30 years between offenses not too remote].)

Fourth, there is little risk the jury confused the uncharged and charged conduct, or the jury would be tempted to punish Alvarado for the uncharged conduct. Nunez and Ashley testified about Alvarado's separate attacks on them. The trial court instructed the jury that "the People presented evidence that the defendant committed the offense of rape of Jazmin Nunez that was not charged in this case," and further instructed the jury on the "limited purpose" for which it could consider that evidence, "[i]f you decide that the defendant committed the uncharged offense." The court emphasized: "Do not consider this evidence for any other purpose except for the limited purpose" defined in the jury instructions. Where the "jury was given an effective instruction by the trial court to consider the evidence only for proper limited

30

purposes, . . . we must presume the jury adhered to the admonitions." (*Hollie, supra,* 180 Cal.App.4th at p. 1277.) Furthermore, because of the similarity of the sexual assaults, the jury was unlikely to convict Alvarado of sexually abusing Ashley to punish him for raping Nunez. (See *Ennis, supra,* 190 Cal.App.4th at p. 734 ["we are confident that whatever 'emotional bias' the Arizona evidence might have tended to invoke against Ennis was nugatory, given the substantially identical evidence offered regarding the California crimes which were actually at issue"].)

Fifth, Nunez testified for only a few hours in a multi-week trial with numerous witnesses. Her testimony did not require an undue consumption of time. The trial court did not abuse its discretion by admitting the uncharged rape evidence pursuant to Evidence Code section 1108.[17]

C.    *Evidence Code Section 1108 Is Constitutional*

Alvarado contends Evidence Code section 1108 is unconstitutional. Alvarado acknowledges the Supreme Court rejected this argument in *Falsetta, supra,* 21 Cal.4th at p. 907. The Supreme Court has "repeatedly declined" to reconsider *Falsetta.* (*People v. Molano* (2019) 7 Cal.5th 620, 664; see *People v. Lewis* (2009) 46 Cal.4th 1255, 1288-1289.) As an intermediate

---

[17]    Because we conclude the trial court did not err in admitting the uncharged rape evidence pursuant to Evidence Code section 1108, the admission of that evidence also did not violate Evidence Code section 1101, subsection (b). (*Erskine, supra,* 7 Cal.5th at p. 296 ["'It follows that if evidence satisfies the requirements of [Evidence Code] section 1108, including that it is not inadmissible under [Evidence Code] section 352, then the admission of that evidence does not violate [Evidence Code] section 1101'"]; *People v. Story, supra,* 45 Cal.4th at p. 1295.)

appellate court, we are bound to follow the Supreme Court's decisions. (*K.R. v. Superior Court* (2017) 3 Cal.5th 295, 308 (*K.R.*) ["'it is established that a holding of the Supreme Court binds all of the lower courts in the state, including an intermediate appellate court'"]; *People v. Johnson* (2012) 53 Cal.4th 519, 527-528 (*Johnson*) [decisions of Supreme Court are binding on appellate courts]; *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*) ["[t]he decisions of this court are binding upon and must be followed by all the state courts of California"].)

D.     *Instruction with CALCRIM No. 1191 Did Not Violate Alvarado's Constitutional Rights*

The trial court instructed the jury with CALCRIM No. 1191 (evidence of uncharged sex offense):[18]  "The People have presented evidence that the defendant committed the crime of rape of Jazmin Nunez that was not charged in this case.  This crime is defined for you in these instructions.  [¶]  You may consider this evidence only if the People have proved, by a preponderance of the evidence, that the defendant in fact committed the uncharged offense.  [¶]  Proof by a preponderance of the evidence is a different burden of proof than proof beyond a reasonable doubt.  [¶]  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.  If the People have not met this burden, you must disregard this evidence entirely.  [¶]  If you

---

[18]     "In March 2017, CALCRIM No. 1191 was modified to distinguish uncharged offenses offered as propensity evidence from charged offenses offered for that purpose.  CALCRIM No. 1191A now applies to the former, while CALCRIM No. 1191B applies to the latter."  (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 496, fn. 1.)

decide that the defendant committed the uncharged offense, you may but are not required to conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit sexual offenses in counts five and six as charged here.  [¶]  If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider, along with all the other evidence.  [¶]  It is not sufficient by itself to prove that the defendant is guilty of the charges alleged in counts five and six.  The People must still prove each charge beyond a reasonable doubt.”  Alvarado argues instruction with CALCRIM No. 1191 violated his due process rights because it permitted the jury to infer his guilt of the charged counts based on a propensity to commit sexual crimes.[19]

CALCRIM No. 1191, as given here, correctly stated the law regarding the jury’s use of evidence of an uncharged sexual offense.  In *People v. Reliford* (2003) 29 Cal.4th 1007 (*Reliford*), the Supreme Court held that CALJIC No. 2.50.01, the former propensity evidence instruction given in sex offense cases, correctly stated the law and did not violate due process.  (*Reliford*, at pp. 1009, 1012-1016.)  In *People v. Cromp* (2007)

---

[19]    Alvarado did not forfeit this argument because the alleged instructional error affects his substantial rights.  (*People v. Mitchell* (2019) 7 Cal.5th 561, 579-580 [“because [appellant] failed to object below, his state law claims asserting error on the instructions have been forfeited.  [Citation.]  But failure to object to instructional error will not result in forfeiture if the substantial rights of the defendant are affected.  [Citations.]  Here, [appellant] claims that the flawed instructions deprived him of due process, and because this would affect his substantial rights if true, his claim is not forfeited”].)

33

153 Cal.App.4th 476, the court held that CALCRIM No. 1191 is not materially different from CALJIC No. 2.50.01, and the court thus rejected the defendant's due process challenge to CALCRIM No. 1191. (*Cromp*, at p. 480.) The Supreme Court and other appellate courts have reached the same conclusion. (See *People v. Villatoro* (2012) 54 Cal.4th 1152, 1160; *People v. Phea* (2018) 29 Cal.App.5th 583, 609 (*Phea*); *People v. Schnabel* (2007) 150 Cal.App.4th 83, 87.) For the purpose of evaluating Alvarado's contentions, there is "no material difference" between CALCRIM No. 1191 and its predecessor CALJIC No. 2.50.01. (*Phea*, at p. 609.) We are bound to follow *Reliford* and *Villatoro*.[20] (*K.R.*, *supra*, 3 Cal.5th at p. 308; *Johnson*, *supra*, 53 Cal.4th at pp. 527-528; *Auto Equity Sales*, *supra*, 57 Cal.2d at p. 455.)

---

[20] Alvarado also argues CALCRIM No. 1191, read together with CALCRIM No. 200 (duties of judge and jury) and CALCRIM No. 224 (circumstantial evidence: sufficiency of evidence), confused and misled the jury about the burden of proof. Neither CALCRIM No. 200 nor CALCRIM No. 224 refers to uncharged sexual offense evidence. Further, CALCRIM No. 1191 states that if the jury concludes the defendant committed the uncharged offense, "[t]he People must still prove each charge beyond a reasonable doubt." The court also instructed the jury that "[u]nless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." Alvarado has not demonstrated these instructions confused or misled the jury. (See *Phea*, *supra*, 29 Cal.App.5th at p. 613 ["it is apparent our high court saw no conflict between the [Evidence Code] section 1108 instruction and the circumstantial evidence instruction"].)

34

E.   *Instruction with CALCRIM No. 1193 Did Not Violate*
     *Alvarado's Constitutional Rights*

The trial court instructed the jury with CALCRIM No. 1193 (testimony on child sexual abuse accommodation syndrome):  "You have heard testimony from Mindy Mechanic regarding child sexual abuse accommodation syndrome.  Her testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Ashley A.'s conduct was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony."  Alvarado argues CALCRIM No. 1193 erroneously instructed the jury it could use child sexual abuse accommodation syndrome (CSAAS) evidence to evaluate the believability of Ashley's testimony, which lessened the People's burden of proof and violated Alvarado's constitutional rights.

"[E]xpert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident— e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.  [Citations.]  'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'"  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301 (*McAlpin*).)

CALCRIM No. 1193, as given here, correctly stated the law regarding the jury's use of CSAAS evidence.  *McAlpin* provides that CSAAS evidence is admissible to rehabilitate a victim's

35

"credibility" when it is at issue, as Ashley's was in this case. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.) In accordance with *McAlpin*, CALCRIM No. 1193 instructs the jury it may use CSAAS evidence to evaluate the "believability"—that is, the credibility—of the witness. The instruction also states the CSAAS evidence "is not evidence that the defendant committed any of the crimes charged against him." Alvarado's contention that CALCRIM No. 1193 improperly instructs the jury that it may use CSAAS evidence to evaluate the believability of the victim's testimony is essentially an argument *McAlpin* was wrongly decided. We are bound to follow *McAlpin*. (*K.R.*, *supra*, 3 Cal.5th at p. 308; *Johnson*, *supra*, 53 Cal.4th at pp. 527-528; *Auto Equity Sales*, *supra*, 57 Cal.2d at p. 455.)

F.    *The Multiple-murder and Lying-in-wait Special Circumstances Are Constitutional*

Section 190.2, subdivision (a)(3), provides a penalty of death or life imprisonment without parole for a defendant found guilty of first degree murder with a special circumstance of committing multiple murders. Section 190.2, subdivision (a)(15), provides a penalty of death or life imprisonment without parole for a defendant found guilty of first degree murder with a special circumstance of intentionally killing the victim by means of lying in wait. Alvarado argues these statutes are unconstitutional because both too broadly make defendants death eligible. The Supreme Court has repeatedly rejected these arguments. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 934 [multiple-murder]; *People v. Solomon* (2010) 49 Cal.4th 792, 843 [multiple-murder]; *People v. Stevens* (2007) 41 Cal.4th 182, 203-204, 211 [multiple-murder and lying-in-wait]; *People v. Nakahara* (2003) 30 Cal.4th 705, 721 [lying-in-wait]; *People v. Gutierrez* (2002)

36

28 Cal.4th 1083, 1148-1149 [lying-in-wait].) We are bound to follow the Supreme Court's decisions. (*K.R.*, *supra*, 3 Cal.5th at p. 308; *Johnson*, *supra*, 53 Cal.4th at pp. 527-528; *Auto Equity Sales*, *supra*, 57 Cal.2d at p. 455.)

G.     *Section 190.5 Is Constitutional*

Section 190.5 gives a trial court discretion to sentence a 16- or 17-year-old juvenile offender convicted of special circumstance murder to either life without parole or 25 years to life. Section 3051, as amended by Senate Bill No. 394, provides that a juvenile offender serving a life without parole sentence is eligible for parole after 25 years. Alvarado contends these sentencing provisions violate the Eighth Amendment's prohibition on cruel and unusual punishment because the future parole hearing "may be taken away at any time by future legislative action."

In *People v. Gutierrez* (2014) 58 Cal.4th 1354 the Supreme Court "adopt[ed] the construction" of section 190.5, subdivision (b), that "render[ed] it "'free from doubt as to its constitutionality,'"" and held that "section 190.5(b) confers discretion on the sentencing court to impose either life without parole or a term of 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstance murder, with no presumption in favor of life without parole." (*Id.* at p. 1387.) We are bound to follow *Gutierrez*. (*K.R.*, *supra*, 3 Cal.5th at p. 308; *Johnson*, *supra*, 53 Cal.4th at pp. 527-528; *Auto Equity Sales*, *supra*, 57 Cal.2d at p. 455.) Alvarado's argument that he may someday be deprived of a parole hearing is speculative. (See *People v. Lozano* (2017) 16 Cal.App.5th 1286, 1288-1289 [dismissing appeal as moot because after enactment of section 3051 "Lozano is no longer subject to [a life without parole] sentence"].)

37

H.   *Alvarado Forfeited His Challenges to the Restitution and Sex Offender Fines*

At Alvarado's sentencing hearing on May 1, 2018, the trial court ordered Alvarado to pay a $10,000 restitution fine pursuant to section 1202.4, subdivision (b), and a $200 sex offender fine pursuant to section 290.3.  Alvarado did not object to either fine at the sentencing hearing.

On July 19, 2019 Alvarado filed a motion in the trial court to strike or stay the restitution fine and to strike the sex offender fine pursuant to this court's decision in *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).  In *Dueñas*, this court held that imposing assessments on "indigent defendants without a determination that they have the present ability to pay violates due process under both the United States Constitution and the California Constitution," and that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay before it imposes [such] assessments."[21]  (*Id.* at pp. 1164, 1168.)  Alvarado argued he "will likely be destitute for the rest of his life.  He was appointed counsel in [the trial court] and in the court of appeal.  He is indigent, and there has been no showing he has an ability to pay the fines and fees—now or ever."  The trial court denied the motion on August 6, 2019.

---

[21]   In *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844, the Supreme Court has directed the parties to brief the following issues:  "Must a court consider a defendant's ability to pay before imposing or executing fines, fees, and assessments?  If so, which party bears the burden of proof regarding defendant's inability to pay?"

Citing *Dueñas*, Alvarado argues the restitution and sex offender fines should be stricken or stayed unless and until the People demonstrate Alvarado can pay them. Alvarado forfeited these arguments.

Section 1202.4, subdivision (b), states: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record." A restitution fine under section 1202.4, subdivision (b), "is intended to be, and is recognized as, additional punishment for a crime." (*Dueñas*, *supra*, 30 Cal.App.5th at p. 1169.) Under section 1202.4, subdivision (c), the trial court may not consider a defendant's ability to pay when imposing the minimum restitution fine of $300, but the court may consider the defendant's ability to pay if the court imposes a restitution fine above the minimum. (*People v. Miracle* (2018) 6 Cal.5th 318, 356 (*Miracle*); *see* § 1202.4, subd. (d) ["[i]n setting the amount of the [restitution] fine . . . in excess of the minimum fine," the court "shall consider any relevant factors, including, but not limited to, the defendant's inability to pay"]; *Dueñas*, at p. 1170, fn. 6 ["a trial court may . . . consider a defendant's ability to pay if the court is considering imposing a restitution fine in excess of the statutory minimum amount"].)

Here, because the $10,000 restitution fine exceeded the statutory minimum, Alvarado had the opportunity to object at the sentencing hearing based on an inability to pay. By failing to object, Alvarado forfeited the argument the trial court erred by imposing the fine without considering his ability to pay. (See *Miracle*, *supra*, 6 Cal.5th at p. 356 ["[b]ecause [the] defendant did not object to the [restitution] fine at his sentencing hearing, he has forfeited his challenge"]; *People v. Avila* (2009) 46 Cal.4th 680, 729

["in not adducing evidence of his inability to pay" a $10,000 restitution fine, the defendant "forfeited the argument"]; *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*) [defendant "forfeited any ability-to-pay argument regarding the restitution fine by failing to object"].)

Alvarado also forfeited his challenge to the $200 sex offender fine. Under section 290.3, subdivision (a), the trial court must impose a fine on every person convicted of a sex offense specified in section 290, subdivision (c), "unless the court determines that the defendant does not have the ability to pay the fine." (§ 290.3, subd. (a).) By failing to object to the sex offender fine at sentencing, Alvarado forfeited the argument the trial court erred by imposing the fine without considering his ability to pay. (See *People v. Acosta* (2018) 28 Cal.App.5th 701, 705; *People v. McMahan* (1992) 3 Cal.App.4th 740, 749-750 ["[i]t should be incumbent upon the defendant to affirmatively argue against application of the [section 290.3 sex offender] fine and demonstrate why it should not be imposed," in part because "the most knowledgeable person regarding the defendant's ability to pay would be the defendant himself"].)[22]

---

[22]    Furthermore, by failing to object to the $10,000 restitution fine, which is many times greater than the $200 sex offender fine, Alvarado demonstrated he would not have challenged or argued he did not have the ability to pay the $200 fine, even if *Dueñas* had been decided when the trial court sentenced Alvarado, and even if section 290.3, subdivision (a), did not address a defendant's ability to pay the fine. (See *People v. Smith* (2020) 46 Cal.App.5th 375, 395 [defendant forfeited his challenge to assessments and fines because he "did not object in the trial court on the grounds that he was unable to pay, even though the trial court ordered him to pay the $10,000 statutory maximum restitution fine"]; *Gutierrez*,

## DISPOSITION

The judgment is affirmed.


McCORMICK, J.*

We concur:


SEGAL, Acting P. J.


FEUER, J.

---

*supra*, 35 Cal.App.5th at p. 1033 ["[a]s a practical matter, if [the defendant] chose not to object to a $10,000 restitution fine based on an inability to pay, he surely would not complain on similar grounds regarding an additional $1,300 in fees"]; but see *People v. Taylor* (2019) 43 Cal.App.5th 390, 400-401 [defendant did not forfeit *Dueñas* challenge to court operations and facilities assessments, even though he did not object to the maximum $10,000 restitution fine, because the "defendant's inability to pay is just one among many factors the court should consider in setting the restitution fine above the minimum"].)

* Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.